*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GARDNER, Minors.

UNPUBLISHED
June 29, 2023

Nos. 364403; 364405
Mecosta Circuit Court
Family Division
LC No. 22-006796-NA

Before: GLEICHER, C.J., and RICK and MALDONADO, JJ.

PER CURIAM.

In these consolidated appeals, respondent-father and respondent-mother appeal by right the trial court's order terminating respondent-father's parental rights to SJG (who was less than a year old at the time of termination) and respondent-mother's parental rights to SJG and SKG (who was 15 years old at the time of termination). Respondent-mother was the mother of both children, and respondent-father was only the father of SJG. SKG's father is deceased. The respondents' parental rights were terminated pursuant to MCL 712A.19b(3)(b)(*i*) (parent's act caused sexual abuse to child or sibling), (b)(*ii*) (failure to prevent sexual abuse to child or sibling), (b)(*iii*) (nonparent's act caused sexual abuse), (j) (reasonable likelihood of harm if returned to parent), (k)(*ii*) (parent abused child or sibling and abuse included criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate), and (k)(*ix*) (parent abused child or sibling and abuse included sexual abuse).

Neither party disputes that the grounds for termination of parental rights were established by clear and convincing evidence with respect to both children, and we affirm with respect to SKG. However, there was no testimony offered in the trial court regarding SJG. Therefore, we must reverse the trial court's findings that termination of respondent-mother's and respondent-father's parental rights to SJG was in the best interests of the child. We remand this case to the circuit court for a new hearing solely regarding SJG's best interests.

## I. BACKGROUND

When the petition in this matter was filed, both respondents already had a history with Child Protective Services (CPS). Respondent-mother had been investigated for improper supervision and physical neglect arising out of her use of methamphetamine, for which she had completed services a few months previously. Respondent-father had been investigated for

-1-

sexually assaulting another minor child, for which he was ultimately convicted of second-degree criminal sexual conduct, MCL 750.520c(2)(b) (victim under the age of 13), and placed on the sex offender registry.

SKG and respondent-mother moved into respondent-father's mother's house in the spring of 2020, when SKG was 13 years old, and shortly thereafter, respondent-father began touching SKG in a sexual manner. The abuse progressed to directing SKG to engage in sexual intercourse with him. Respondent-father sexually assaulted SKG on multiple occasions, and respondent-mother was aware of those sexual assaults. A few months after the abuse began, SKG was forced to move out of respondent-father's mother's house—while respondent-mother remained—because being around SKG was a violation of respondent-father's probation.[1] The assaults paused while respondent-mother was living apart from SKG. Eventually, SKG and respondent-mother resumed living together away from respondent-father's mother's house. Respondent-mother began driving SKG to respondent-father's home in the middle of the night where she would help SKG climb through a window in order to facilitate the continued sexual abuse. Following SJG's birth, SKG only saw respondent-father when respondent-father came to get SJG.[2] At that time, SKG was nominally watching SJG while respondent-mother was at work, and respondent-father would come to see SJG, and while SJG was sleeping, respondent-father would molest SKG.

The sexual abuse did not end until a then-housemate of respondent-mother discovered that respondent-father had taken numerous video recordings of respondent-father molesting SKG. An employee of the Department of Health and Human Services (DHHS) went to ask respondents some initial investigative policy questions, and she discovered respondents living in a dilapidated pop-up camper. She arrived to find respondent-mother begging respondent-father not to leave because she loved him and respondent-father screaming at respondent-mother for having cut herself and for having failed to acquire a phone for him. The DHHS employee asked nothing about the sexual abuse allegations, but respondent-father nevertheless went on a spontaneous "rant." As the DHHS employee described it,

> in the process of [respondent-father's] rant, he did make comments that were concerning to me because they were about his sexual deviant history and about— they were just sexually inappropriate in nature. And so I did make note of those individual comments . . . . I—and these are quotes from him. "I have a sexual behavior problem", "I molested an eight-year-old girl", "They are saying I raped [SKG], but I don't force anyone", "I'm not saying I didn't do it, I'm not saying I did do it, I'm not saying anything", "I'm not a forceful guy", "I don't hold people

---

[1] Respondent-father was placed on probation and on the sex offender registry follow a guilty plea to one count of CSC-II MCL 750.520c(2)(b) (victim under the age of 13).

[2] In a case service plan that was admitted into evidence without objection at the termination hearing, the foster care worker noted that she had received a report "that the circumstances involving the conception of [SJG] would make it not possible for [respondent-father] to be the father," and the foster care worker "assumed that [respondent-father] signed the birth certificate in order to reside in the household with [SKG]." This possibility was not further explored, and respondent-father remained the legal father of SJG.

down", "Even though she was eight, she consented", "I deeply feel that there should be an age cap, but if you believe you can consent", and the final quote I have is, "I have been out of prison for two years and I could have had multiple victims by now if I wanted. There were plenty of opportunities to go snatch up children if I wanted to." And all of that was in the context of, you know, his rant about there's no evidence against him.

A Mecosta County Sheriff's Deputy interviewed respondent-mother, who admitted that she knew respondent-father was molesting SKG, that she drove SKG to respondent-father's home, and that she helped SKG sneak through the window. Respondent-mother also disposed of the phone with the incriminating media at respondent-father's direction, and the phone was ultimately not recovered. Respondent-mother made similar admissions to another CPS investigator.

At the conclusion of an adjudication bench trial, the trial court summarized the testimony and found that "just really a thousand-foot overview, [SKG] was having sexual intercourse with [respondent-father] and her mom knew it happened and, in fact, facilitated that sexual intercourse by taking her over in a vehicle." The trial court stated that it found SKG's testimony highly credible, and it articulated on the record its reasons for that finding. The trial court took jurisdiction over the children as to both parents. DHHS sought termination at the initial disposition, and at the ensuing termination hearing the only additional evidence admitted consisted of three parent-agency treatment plans and the case service plan. The trial court relied on the evidence already in the record and found statutory grounds for termination established by at least clear and convincing evidence as to both children and both parents.

The trial court also found termination to be in both children's best interests. Additionally, the trial court found that both parents had demonstrated "a depraved ability to provide love, affection, and guidance," and stated that they "belong[ed] in the dictionary . . . as a definition of somebody without any moral fitness." The trial court opined that respondent-mother must "be mentally ill or mentally disturbed to facilitate the repeated rape of her young daughter," invoking the maxim of res ipsa loquitur. It similarly invoked the maxim of res ipsa loquitur as to respondent-father, noting that respondent-father not only raped SKG, but also an eight-year-old child. The court, repeating respondent-father's own prior statements, noted that he had "a penchant for moms with younger kids who will give it up better than their mamas." It concluded that as to both respondents, there was no possible way to "cure or fix or stop such a shocking deviant behavior" within a reasonable time.

As to SKG, the trial court regarded respondent-mother's actions as "sickening" and almost guaranteed to recur if SKG was returned; it noted that SKG placed with a relative, but a guardianship could not safeguard SKG, who "needs to cut ties and run as far from her mother as possible." As to SJG, the trial court invoked the doctrine of anticipatory neglect, expressly rejecting the notion that any significance should be assigned to the fact that SJG was an infant, male, and respondent-father's own child. It did not express the belief that respondents would necessarily abuse SJG in precisely the same way, but it concluded that respondent-father would eventually abuse SJG and respondent-mother would eventually "pimp out" SJG. It noted that, SJG would suffer emotional harm by being present in "a situation where children having sexual intercourse within the home is normalized and acceptable," and SJG's "mentality would be harmed as well with the knowledge that his mother pimped him out—or pimped his sister out to his father."

Respondent-father's "scheming" would inevitably harm any child to whom he had access. The trial court again recognized that SJG was placed with a relative, but it concluded that SJG's only hope to grow up in a healthy environment was to cut all ties with respondents. It therefore terminated respondents' parental rights, and these appeals followed.

## II. STANDARDS OF REVIEW AND GOVERNING LAW

The trial court's factual findings regarding the best interests of a child are reviewed for clear error. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted). Under the clearly erroneous standard, a trial court's decision must be "more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009). "Any related statutory interpretation poses a question of law reviewed de novo, as does the question whether the trial court conformed to the applicable procedural rules." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (citations omitted).

"The trial court must order the parent's rights terminated if the Department has established a statutory ground for termination by clear and convincing evidence and it finds from a preponderance of the evidence on the whole record that termination is in the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The focus of the best-interests analysis is on the child's rights and interests, not the parent's rights and interests. *In re Moss*, 301 Mich App at 87-88. At this stage, "the parent has been found unfit, [so] the focus shifts to the child and the issue is whether parental rights *should* be terminated, not whether they *can* be terminated." *Id*. at 89. The trial court should address the best interests of each child individually if the best interests of those children are significantly different, but the trial court need not make redundant factual findings. *In re White*, 303 Mich App at 715-716.

The child's best interests depend on a multitude of factors, including the child's bond with the parent, the parent's parenting ability, the child's need for permanency, the relative advantages of the foster placement, the child's age, inappropriate parenting techniques, continued involvement in domestic violence, the parent's history of visitation, the parent's own questionable relationships, the parent's compliance with treatment plans, the child's well-being in foster placement, and the possibility of adoption. *In re Sanborn*, 337 Mich App 252, 276-277; 976 NW2d 44 (2021). "Furthermore, the court *may* utilize the factors provided in MCL 722.23." *In re Medina*, 317 Mich App at 238 (quotation marks and citation omitted). When making its best-interests determination, the trial court may rely on the entire record, including evidence used to establish statutory grounds for termination. *In re Trejo*, 462 Mich 341, 353-354; 612 NW2d 407 (2000).

## III. SKG

Aside from a conclusory statement that "it is not in the best interests of either child" for respondent-mother's parental rights to be terminated, respondent-mother does not provide any meaningful arguments in opposition of the termination of her parental rights to SKG. Regardless, the evidence was clearly sufficient for the trial court to so conclude. Not only was respondent-mother aware of the fact that respondent-father was regularly molesting SKG, she actively

-4-

facilitated these assaults by driving SKG to respondent-father's home and helping her climb through the window. Given these facts, it cannot be said that the trial court's finding that termination was in SKG's best interests was clearly erroneous.

## IV. SJG

Both respondents argue that the trial court clearly erred by finding that termination was in the best interests of SJG because there was no evidence regarding SJG's needs, and the evidence presented exclusively pertained to the abuse perpetrated against SKG. We agree.

No testimony was presented at the termination hearing, and none of the testimony at the adjudication trial had anything to do with SJG. Instead, it was exclusively about respondent-father's sexual abuse of SKG and respondent-mother's role in facilitating it. Five witnesses testified at the adjudication trial: SKG testified about her personal experience with the abuse; a CPS investigator testified about her interactions with respondents when she went to speak with them at their camper; another CPS worker testified about a conversation in which respondent-mother described the sexual abuse of SKG; a Sheriff's Deputy testified about his investigation into the abuse; and respondent-mother's former housemate testified about finding a sexually explicit video involving respondent-father and SKG. The record is almost wholly bereft of information regarding SJG. No one testified about SJG's health, his development, his needs, or his relationship with his parents. No one even testified that termination of parental rights was in his best interest. No one testified that he was in any sort of danger. Termination of parental rights cannot be based on assumptions, there needs to be a record for appellate review.

DHHS relies on the doctrine of anticipatory neglect. "The doctrine of anticipatory neglect recognizes that how a parent treats one child is certainly probative of how that parent may treat other children." *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020) (quotation marks, citation, and alteration omitted).[3] While the treatment of one child can support an inference regarding the treatment of another child, "the probative value of such an inference is decreased by differences between the children, such as age and medical conditions." *Id*. "Although evidence of how parents treat one child may be probative of their treatment of another, such evidence is not conclusive or automatically determinative." *Matter of Kantola*, 139 Mich App 23, 28; 361 NW2d 20 (1984). In this case, however, the doctrine of anticipatory neglect was necessarily determinative because there was no evidence regarding SJG. While the doctrine is highly probative in a case with such extreme facts as this one, it does not give courts license to terminate parental rights without hearing any evidence regarding the particular child's best interests.

## V. CONCLUSION

We affirm the trial court's order terminating respondent-mother's parental rights to SKG. We affirm the trial court's findings that statutory grounds for termination of respondent-mother's and respondent-father's parental rights to SJG were established by clear and convincing evidence.

---

[3] "[T]he doctrine is not a perfect fit" for respondent-father "because [SKG] is not [his] child . . . ." *In re Mota*, 334 Mich App 300, 323; 964 NW2d 881 (2020).

We reverse the trial court's findings that termination of respondent-mother's and respondent-father's parental rights to SJG was in the best interests of the child. We remand this case for an evidentiary hearing regarding the best interests of SJG. We do not retain jurisdiction.[4]

/s/ Elizabeth L. Gleicher
/s/ Michelle M. Rick
/s/ Allie Greenleaf Maldonado

---

[4] We note that respondent-mother also argues that the trial court erred by using the child custody best interest factors set forth in MCL 722.23. However, this argument has been squarely rejected by both our Supreme Court, *In re McCarthy*, 497 Mich 1035; 864 NW2d 139 (2015), and this Court, *In re Medina*, 317 Mich App at 238. Thus, this argument is without merit.